## No. 11,816.

## SUCCESSION OF MARY UNFORSAKE—TUTORSHIP OF THE MINOR BESSIE LUTT.

The tutor some time after he had qualified in that capacity adopted his ward by authentic act duly authorized.

After the adoption a relative of the minor obtained the appointment of under tutor and moved the court to compel the tutor to file an account of tutorship.

The account was filed, but a protest was made on the ground that as an adoptant, succeeding to the father, and his wife to the mother, he owed an account to the ward only, and that at her majority or emancipation.

The court holds that the tutor may adopt his ward, but that he does not thereby acquire any right over the minor's estate that he did not have as tutor.

He can not lessen his responsibility, or that of the securities on his bond as tutor by becoming an adoptant.

On the second branch of the case, under the textual provision of the Civil Code the court holds " that the tutor is bound to give an account of his administration whenever he is ordered to do so by the judge."

And that while the costs are to be paid out of the minor's estate, ordinarily, there is no necessity for very expensive litigation and large bills of costs.

APPEAL from the Civil District Court for the Parish of Orleans. King, J.

*Benjamin Rice Forman* for Charles Baur, Tutor, Appellee.

*Carroll & Carroll* for Thomas Powell, Under-tutor, Appellant.

Argued and submitted February 26, 1896.
Opinion handed down March 9, 1896.

The opinion of the court was delivered by

BREAUX, J. The plaintiff, an uncle, as under-tutor of the minor Bessie Lutt, suggesting that no account had ever been filed by Bauer, filed a rule on Bauer, her tutor, to compel him to render an account of tutorship.

Bauer qualified in 1883 tutor of the minor and gave bond with surety in amount equal to the inventory taken at the time.

About four years afterward Bauer and his wife applied to the Civil District Court for permission to adopt the former's ward. Judgment was granted upon the application, and subsequently, by authentic act, the minor was adopted by them. The under-tutor was appointed some time after the minor had been adopted.

Bauer interposed an exception to the rule, averring that the appointment of Powell as under-tutor was void; that by the effect of the adoption he and his wife became the legal parents of the minor; entitled to the usufruct of the property, and that he owed no account until her majority or emancipation.

Moreover, the defendant in rule pleaded; if Powell had been appointed under-tutor that the only action is one of removal and to cause another tutor to be appointed.

The exception was maintained by the District Court and the rights of the minor reserved were to be asserted when she becomes of age.

The under-tutor appeals from the judgment.

We will not specially pass upon the validity of the adoption. We have found no reason to declare it invalid.

The following propositions suggest questions presented for our determination:

1. The effect of the adoption upon the tutorship.

2. The right of action of the under-tutor against the tutor.

The different statutes relative to adoption do not change the responsibility of the tutor or lessen his obligation to account for his administration. These statutes do not, either expressly or by implication, amend the articles of the Civil Code on the subject of tutorship.

The provisions of the Code throughout are that the tutor shall have the care of the person and property of the minor.

The statutes relative to adoption have not given to the word " adoption " the broad and unrestricted meaning, in so far as relates to the persons adopting, that it had during early periods in the history of the civil law, when the adoptant was entitled to the property of the son and exercised toward him all the rights and privileges of a father; in short, when the relationship was to all intents and purposes the same as existed between natural father and son; when persons brought into a family by adoption obtained the same rights as if they had been born in that family, and when on the other hand persons who passed out of the family by adoption, which brought them under a new *patria potestas*, lost all which had been theirs by birth.

This was the view, substantially taken of the Roman law in several decisions of this court, in so far as the person adopted was concerned.

The first was the case of Vidal vs. Commagere, 13 An. 516.

The rights of the adoptant were never referred to in any of the decisions of this court, save in one case, and that does not sustain the contention of the tutor and adoptant here.

We refer to the case of Succession of Forstall, 25 An. 430. The law upon the subject has not been uniform and unvarying. It has been altered, and important changes made even under the Romans at a period later than that above referred to in the history of the civil law.

We copy from D. I, T. 7, C. VIII, T. 48:

*Sed hodie ex nostra constitutione cum filius-familias a patre naturali extraneæ personæ in adoptionem datur, jura patris, naturalis minime dissolvuntur; nec quicquam ad patrem adoptivum transit nec in potestate ejus est; licet ab intestato jura successionis ei a nobis tributa sint.*

From this extract it is evident that under the reign of Justinian the power of the father was not entirely dissolved by the adoption of his child.

The principle relative to adoption has encountered downright opposition at times.

The Israelites of old were unacquainted with the process of adoption; it would have been, with them, inconsistent with the Mosaic law regarding the inheritance of property. The views of their descendants upon the subject are not as rigid and unbending.

The conclusions of Mr. Laurent, the French commentator, are decidedly against the process of adoption. He announces unqualifiedly that the ancient Germans ignored all laws upon the subject, and made part of their unvarying custom " *adoption n'a lieu.*"

But on the other hand Merlin is authority for the statement that adoption among the ancient Germans was made with military ceremony; that in compliance with that custom, Guetrai, King of Orleans and Burgundy, wishing to declare his nephew Childebert of age, and to adopt him, said to him: "I have placed this javelin in your hands to make known that I have given you my kingdom." Turning to the assembly he said: "My son Childebert is now a man, obey him." History recounts that he was obeyed. Godefroy, duke of lower Lorraine, was adopted and invested with imperial robes by the Emperor Alexis in 1096. Baudoin, his brother, was adopted by the Prince de'Edesse.

In early epochs there were adoptions in France and laws prevailed under some of the " *coutumes* " relative to the process of adoption in other " *coutumes,*" *adoption · n'a lieu*, it was said. We read that under the *coutume* of Audernerde the stranger was not excluded from the custom of adoption provided he chose to take the name of the adoptant and bear arms in his behalf.

But the stranger did not thereby become the owner of the adoptant's property. He became the owner only by donation *inter vivos* or *mortis causa*. There was also in France another sort of adoption (only with the consent of the parents) for orphan children in asylums by those in charge. The rectors of these institutions, as adopting parents, had charge of the education and of the property of the *adopté*. The authority ceased at the majority of the latter.

Adoption was reinstituted throughout France after the revolution. The commission appointed by the First Consul and charged with

preparing a project for a civil code were opposed to the complete changes effected under the Roman laws of adoption. Under the Code Napoleon there is not an absolute change of family. Laurent, Vol. 4, p. 273.

The extreme views of the First Consul, as a member of the Council of State, in support of unlimited reciprocal obligation between the adoptants and *adoptés*, as at Rome, were not received and treated with favor in the debates of the body which led to the adoption of the Code Napoleon. That code, as a result, does not seek to emancipate the *adopté* from all ties and place him entirely and exclusively under all circumstances under the absolute control of the new father and mother. Laurent, Vol. 4, p. 272.

Under the English law if a man undertakes to rear a child not his own the law will hold him to his undertaking, and compel him, as far as possible, to rear him in a proper manner.

Prior to 1865 in this State, adoption under general laws was prohibited.

The laws upon the subject, enacted since, are silent in many respects as to the effect intended. They, in the main, give the needful authority to adopt. This court has, in several decisions, construed the extent of the right of the persons adopted. We will state, in passing, that it is not our purpose to abridge any of these rights.

In referring to history we have not found that in so far as relates to the adoptant, adoption always has the meaning it is here contended it has.

The extent of the right and the meaning of the word can not be determined with precision by reference to history. It is ever varying, as we have already noted, with the times, customs and ideas. In modern times such antagonism to the laws and customs have been defeated; justly defeated we may say but the purpose seems to have been assistance to the one adopted, and there was indifference to the interest of the adoptant.

The court can not supply those measures which the legislator has omitted or forgotten.

We have not found that adoption gives a right of usufruct to the property of the one adopted, nor that it relieves the tutor from accounting as a tutor.

We conclude on this point: the tutor may adopt his ward with the consent of the parents, but it in no wise relieves him from his responsibility as a tutor, as he, as an adoptant, does not succeed to all the rights of the father and mother.

This brings us to the second branch of the case; that the under-tutor is not the proper person to demand the filing of the tutor's account; that his action must be restricted to an action for removal

The article of the Code is plain, and, we think, is a complete answer to the tutor's contention on this point.

If the tutor should neglect to render his annual account, the under-tutor must notify the judge, whereupon the latter shall order him to account.

That was the action of the court in this case.

Although it is true that the court will not settle the tutor's account, until some time after the ward comes of age, that the ward may have opportunity to investigate it; yet the law requires accounts prior to the majority, whenever it is deemed to the minor's interest.

Something was said in argument at the bar about costs that the annual account would occasion.   We do not see the necessity, under all circumstances, for incurring large bills of costs and for other charges.

The tutor should file his annual account, showing debits and credits, during the year.  Ordinarily it does not require professional skill to prepare such an account for the examination of the court, in order that the court may determine whether the estate of the minor is properly administered.  Of this, by reference to the account vouchers, and other evidence, if necessary, the court should be entirely satisfied.  We do not wish, however, to be understood as saying that there is never occasion for litigation in matter of these accounts.  Whenever the necessity arises as in the present case, counsel is entitled to a fair compensation.  In fixing principles in the interest and for the protection of minors, counsel representing their tutors should be paid by them.

The account of the tutor has been filed and is now before the District Court for its action.  The tutor has reserved the right, when his account was filed, to have the questions here decided.

The case must be remanded in order that the court may pass upon the items of the account.

It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed.

It is further ordered, adjudged and decreed that the case be remanded and the issues tried and decided in accordance with the views herein expressed.

That the appellee pay costs of appeal.